## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Bruce Rutschke,

                    Plaintiff,          Civ. No. 04-3212 (RHK/AJB)
                                       **MEMORANDUM OPINION**
                                       **AND ORDER**

v.

Northwest Airlines, Inc.,

                    Defendant.

---

Daniel E. Warner, Warner Law Office, Inver Grove Heights, MN, for Plaintiff.

Tracy J. Van Steenburgh, Halleland Lewis Nilan & Johnson, P.A., Minneapolis, MN, for Defendant.

---

### Introduction

Plaintiff Bruce Rutschke worked for Defendant Northwest Airlines, Inc. ("Northwest") from March 1965 until his retirement in March 2004. He brings this action alleging interference with his right to medical leave in violation of the Family Medical Leave Act ("FMLA"), as well as claims of disability and age discrimination in violation of state and federal statutes. Northwest has moved for summary judgment on all claims. For the reasons set forth below, Northwest's Motion will be granted.

## Background

### A.      Rutschke's Employment with Northwest

Rutschke worked at Northwest from March 5, 1965, until his retirement on March 26, 2004.  He was a member of the Aircraft Mechanics Fraternal Association Union (the "Union") and the terms and conditions of his employment were governed by the collective bargaining agreement between the Union and Northwest (the "CBA").  During his 39 years at the company, he worked in various positions; from March 1989 until his retirement, he worked as an airframe and power plant technician maintaining Northwest's 747's.  (Rutschke Dep. at 7.)

Pursuant to the governing CBA, Rutschke was subject to a system of bidding based on seniority for the positions he held at Northwest.  In April 2003, Northwest implemented a reduction in force.  At that time, Rutschke considered retiring and investigated his retirement options with Northwest's pension department.  (Id. at 117-18.) Rutschke decided not to retire and took a new position pursuant to the CBA bidding system.  In April 2003, Trenton Fields, the shift manager in the engine sheet metal shop, became Rutschke's manager.  Fields was Plaintiff's manager from April 2003 to January 20, 2004, when, pursuant to another reduction in force, Plaintiff bid for and was awarded a position in the composite shop.  He remained in the composite shop until his retirement.

### B.      Allegations and Complaints of Harassment

Rutschke suffers from diabetes, which required him to take intermittent FMLA leave from work due to fatigue and poor circulation, and also required him to occasionally elevate his feet at work.  Rutschke alleges that, from April 2003 to January 2004, the period of time that Fields was Rutschke's supervisor, Fields harassed him based on his age, his disability, and his need for FMLA leave.  According to Rutschke, "from April 2003 it was nothing more than one continual harassment or discrimination after another." (Rutschke Dep. Tr. at 97.)  He identifies numerous specific instances of such harassment.

Rutschke claims that shortly after he began working for Fields, he was instructed to notify Fields personally whenever he was going home on FMLA leave.  (See id. at 122-25.)  This was inconvenient for Rutschke because Fields's office was not located near the building where Rutschke worked.  (Id.)  He felt the requirement was unfair because employees who took sick leave (as opposed to FMLA leave) simply had to notify the crew chief, who was located in the same building that Rutschke worked in.  (Id.)  Rutschke never complained to Fields regarding the requirement because his "feeling was [Fields] didn't really care." (Id. at 125.)

He also alleges that in September 2003, Fields directed him to "clock out" at the end of the day at a different location than the location at which he and his coworkers had previously been clocking out.  This required Rutschke to walk an extra distance.  At first, Rutschke claims he was the only one subjected to this requirement, and the first day he clocked out at the new location, he was subject to "derogatory remarks" from his

3

coworkers.  (Id. at 126.)  A "few days" or a week after Rutschke was instructed to clock

out at the new location, "a memo was put out on the board that everybody was to clock

out [there]."  (Id. at 128; see id. at 129.)  Some of his coworkers followed that directive

and some simply continued to clock out at the original location.  (Id. at 127, 129.)

On September 13, 2003, Rutschke sent an e-mail to Northwest's human resources

department to complain about the incident described above specifically and the treatment

he received from Fields generally.  (Rutschke Aff. Ex. 1.)  Rutschke stated that he

experienced harassment and retaliation from Fields.  He also complained about Fields to

the human resources department five to six weeks prior to the e-mail, and stated that the

"harassment" became worse after that complaint.[1]  (Id.)  The e-mail does not mention any

specific instance of Fields's alleged harassment other than the clocking out incident, nor

does it allege that the harassment was because of Rutschke's age, disability, or FMLA

status.  (Id.)

In October 2003, Rutschke and Fields had a disagreement regarding when

Rutschke would take his lunch break.  (Id. at 132-36.)  Rutschke needed to take his lunch

---

[1]According to Rutschke, the day after his initial complaint to human resources,
Fields told Rutschke that he received a call from human resources and that the two of
them needed "to talk about that."  (Rutschke Dep. Tr. at 142.)  Apparently, however, they
did not discuss the complaint.  Instead, Fields instructed Rutschke to inform the crew
chief "every time you leave the shop" because there were "too many people moving
around outside the shop."  (Id.)  As far as Rutschke knew, none of his coworkers was
subject to the same requirement.  This prompted Rutschke to raise the issue with his crew
chief, who told Rutschke to ignore Fields's directive.  (Id. at 143-44.)  Rutschke did
ignore the directive and he was never disciplined for doing so.  (Id.)  Rutschke did not
report this incident to human resources in his September 13, 2003 e-mail.

break at a certain time because of his diabetes, which Fields initially resisted.  According to Rutschke, while he was surrounded by many of his coworkers, Fields asked him "what medical condition do you have that you can't take your lunch at 7?"  (Id. at 133.) Rutschke refused to answer Fields, and he and his Union representative agreed to meet with Fields later that day.  At that meeting, Rutschke's Union representative asked Fields: "you mean to tell me you're going to discriminate against [Rutschke] because he has diabetes?" and, according to Rutschke, Fields responded "yes."  (Id. at 134.)  Rutschke and his Union representative told Fields that they were going to file a grievance regarding the dispute.  However, he "didn't get a chance to, because 45 minutes later [Fields] come down and he says, okay . . . take your lunch at 6:00," which was the time that Rutschke had requested.  (Id. at 134.)

Rutschke also alleges that Fields subjected his work to closer scrutiny than that of his coworkers.  During one six-day period, Fields showed up at Rutschke's desk every day to check on the status of a project, even though Fields knew that Rutschke did not have the parts required to perform that particular job.  (Id. at 130-31.)  A similar incident involved Fields pressuring Rutschke to work quickly on some parts even though they were not urgently needed.[2]  (Id. at 159-60, 178-80.)

---

[2]Another incident occurred in July 2003, and involved Fields's failure to give Rutschke adequate notice that "he was being bumped from his position."  (Mem. in Opp'n at 6.)  The details of this allegation are not entirely clear from the record, but it appears that, because of Fields's late notice, Rutschke was forced to use seven hours of vacation time while waiting for a new bid.  (See Rutschke Dep. Tr. 167-69; Parchem Aff. ¶ 2.)  It was not the normal practice for employees to have to use vacation time in such

Finally, two of Rutschke's co-workers have submitted affidavits stating that Fields disapproved of Rutschke's need to elevate his feet due to his diabetes. (Stacklie Aff. ¶ 3; Parchem Aff. ¶ 2.) According to one co-worker, "Fields by his mannerisms and body language would repeatedly indicate his displeasure when . . . Rutschke would elevate his legs." (Parchem Aff. ¶ 2.) According to the other coworker, "Fields made obvious his disgust for" Rutschke's need to elevate his feet.[3] (Stacklie Aff. ¶ 3.) There is no allegation that Fields ever interfered with or prevented Rutschke from elevating his feet.

### C.    Rutschke's FMLA Certification

In 1998, due to his diabetes, Rutschke was approved for intermittent leave under the FMLA. Northwest approved his leave request every year thereafter until December 2003. With his request for intermittent leave, Rutschke also submitted a certification form completed by his treating physician. (Warner Aff. Ex. 4.) The certification provided that Rutschke suffered from diabetes and that it was a serious medical condition necessitating that he take up to twelve weeks of intermittent leave per year. For five years before the facts giving rise to this action, Rutschke took intermittent time off from work, and that time was designated as FMLA leave. (Rutschke Dep. Tr. at 22-24.) For a

---

circumstances; usually Northwest would "simply pay for this time." (Parchem Aff. ¶ 2.)

[3]The affidavits do not provide any further detail regarding these allegations, such as what, specifically, Fields did to make his disapproval clear, or when such incidents occurred. Nor does Rutschke himself appear to allege that this specific behavior on the part of Fields occurred.

period of time prior to late 2003, he had been taking his intermittent FMLA leave mainly in half-day intervals.  (Id. at 28-29.)

In October 2003, Rutschke submitted a certification from his physician for FMLA leave as he had in years past.[4]  That certification stated that the "probable duration of" Rutschke's "present inability to work" was "[i]ntermittent inability to work from 1 or 2 days to one week."  (Warner Aff. Ex. 4.)  It stated that the frequency and duration of the current or expected episodes of incapacity was "1-2 day(s) during each . . . week."  (Id.)  The form also stated that Rutschke was "prescribed medications for diabetes and hypertension."  (Id.)  His certification was initially approved by Northwest.  (Fields Dep. Tr. at 33-34.)

In early December 2003, Fields requested that Rutschke have his physician clarify the FMLA certification.  Because both diabetes and hypertension were mentioned on the original certification, Northwest required that the two separate conditions be listed and explained on two separate certification forms.  (See id. at 45-46.)  Northwest also had concerns regarding the inconsistency between the periods of leave on the certification, which only specified whole days, and Rutschke's tendency to take half-days of leave. (Id. at 41-42.)

_____

[4]In July 2003, in an effort to better manage its employees' FMLA needs, Northwest revised its FMLA procedures.  (Fields Dep. Tr. at 9-10; Tanberg Dep. Tr. at 15-16, 20.)  The change involved computerizing the system for requesting, approving, and monitoring FMLA leave, and revising some of the forms previously used in the FMLA certification process.  (Id.)

In response to Fields's request for clarification, Rutschke obtained and submitted to Northwest a new certification from his physician.  That form omitted the reference to his hypertension.  It also stated that the "probable duration of" Rutschke's "present inability to work" was "intermittent inability to work from ½ day to one week," (Warner Aff. Ex. 4 (emphasis added)), and that the frequency and duration of the current or expected episodes of incapacity was "1-4 half day(s) during each . . . week," (id. (emphasis added)).

Northwest determined that the certification was still ambiguous; on December 18, 2003, Fields asked Rutschke to sign an authorization form (the "Release") to allow a doctor representing Northwest to obtain clarification directly from Rutschke's doctor. (Fields Dep. Tr. at 61-62.)  The Release stated that Rutschke authorized his doctor "to release to a health care provider representing [Northwest] medical information and conclusions related to [his] request for FMLA leave as necessary to process this leave request."  (Warner Aff. Ex. 6.)

On January 6, 2004, Rutschke informed Fields that he would not sign the Release. Fields then told Rutschke that his FMLA eligibility was cancelled.  (See id. Ex. 4.)  Fields reported this conversation to Northwest's human resources department (id.), and a human resources employee set up a meeting with Rutschke, his Union representative, two human resources employees, and Fields to further discuss the issue.  At that meeting, on January 8, 2004, Rutschke was informed that further clarification of his certification form would be needed.  (Tanberg Dep. Tr. at 30-31.)  Northwest was concerned that Rutschke's

certification indicated that he might need to work part-time, and if that were the case, an accommodations assessment under the Americans with Disabilities Act might be necessary.  (Tanberg Dep. Tr. at 40; Rutschke Dep. Tr. at 75.)

Rutschke did not produce further clarification of his certification.  He continued to take time off from work from mid-December 2003 until his retirement in March 2004.  (Rutschke Dep. Tr. at 86.)  Fields approved all of his requested time off, though none of the leave he took during that time was designated as FMLA leave.  Instead, Rutschke used vacation and sick time to take his leave.  He was never disciplined for taking that time.[5]  (Id.)

On February 27, 2004, his supervisor wrote him a letter "in an effort to move [his] pending application for FML forward."  (Van Steenburgh Aff. Ex. A.)  The letter stated that Northwest was "asking [Rutschke] to request clarification from" his doctor.  (Id.)  Although not mentioning the Release, the letter specifically asked that Rutschke "ask [his doctor] to clarify his certification form by indicating how often he expects that [Rutschke] will be unable to work in the coming year, and the probable duration of these periods."  (Id.)  The letter further states that until Northwest obtained that clarification, it would "delay [Rutschke's] continuation of FML leave."  (Id.)   Rutschke did not respond to the letter; by the time he received the letter, he had already decided to retire, and there was

_____

[5]This was true despite the fact that, under the CBA, employees who used sick leave on more than three occasions in a six-month period were subject to progressive discipline, unless that sick leave was approved FMLA leave.  (See Rutschke Dep. Tr. at 79-80.)

"no need to be . . . putting in applications for FMLA" at that point.  (Rutschke Dep. Tr. at 89.)

### D.      Rutschke's Decision to Retire from Northwest and the Instant Action

Rutschke first considered the possibility of retiring in April 2003, when Northwest implemented a reduction in force.  At that time, he e-mailed the pension department and inquired as to his options for retirement.  (<u>Id.</u> at 117-19.)  In late October 2003, he again contacted Northwest's pension department to inquire about his options for retiring before he turned 62 years old.[6]  (<u>Id.</u> at 91.)  Neither of those initial inquiries ended with any definite decisions by Rutschke regarding when he wanted to retire.

Northwest experienced another round of layoffs in January 2004.  As he had in April 2003, Rutschke successfully bid for a position and, in mid-January 2004, he was moved to the composite shop, where he was under the direction of a new manager. Rutschke testified that he never experienced any discrimination or harassment during his work at the composite shop.  (Rutschke Dep. Tr. at 98 (Rutschke testified that "[i]t was real good there").)

On January 12, 2004, an individual at the pension department called and asked him whether he had decided on a date for retirement.  He replied that he had not, and "that was the end of the conversation."  (Rutschke Dep. Tr. at 93.)  Then, in late January, after he had moved to the composite shop, he received another call from the pension

---

[6]Rutschke was 61 years old when he retired.  (Rutschke Dep. Tr. at 91.)

department.  Again, he informed the caller than he had not yet picked a date for his

retirement.  (Id. at 93-94.)  After that call, he called his wife to consult with her, and, "two

or three days after that," he called the pension department and obtained information

regarding what his pension payments would be if he retired in March 2004.  (Id.)

Rutschke was told that he would receive $16.00 a month less if he retired in March 2004

as opposed to delaying his retirement until he was 62 years old.  On February 2, 2004,

Rutschke called the pension department and "tentatively" set his retirement date for

March 26, 2004 (id. at 94; Dougherty Dep. Tr. at 26); he retired on that date.  This action

followed three months later.

　　　In his Complaint, Rutschke asserts numerous causes of action under various state

and federal statutes: (1) Northwest interfered with his rights under the FMLA; (2) he was

constructively discharged due to his disability and his age in violation of the Minnesota

Human Rights Act ("MHRA"), the American's with Disabilities Act ("ADA"), and the

Age Discrimination in Employment Act ("ADEA"); (3) he was subjected to harassment

and discrimination due to his disability and his age in violation of the ADA, ADEA, and

MHRA; (4) Northwest failed to make reasonable accommodation for his disability in

violation of the MHRA and the ADA; and (5) Northwest committed acts of reprisal

against him in violation of the MHRA and retaliated against him in violation of the ADA.

Northwest now moves for summary judgment on all of Rutschke's claims.

**Standard of Review**

Summary judgment is proper if, drawing all reasonable inferences favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**Analysis**

**A.      Interference with Rutschke's Rights under the FMLA (Count 1)**

Rutschke claims that Northwest unlawfully interfered with his rights under the FMLA when it refused to authorize his FMLA leave after December 15, 2003.  In mid-December 2003, Rutschke submitted what he claims was a complete certification to Northwest; the certification was filled out by his doctor, it outlined his need for FMLA leave, and had been approved by Northwest in previous years.  Northwest, however,

asked that his doctor provide a clarification regarding, in part, the increments of time Rutschke would need to take off from work.  After he modified his certification form, Northwest requested yet another clarification.  This second request for clarification involved asking Rutschke to sign the Release "authoriz[ing] [his doctor] to release to a health care provider representing [Northwest] medical information and conclusions related to [his] request for FMLA leave as necessary to process this leave request." (Warner Aff. Ex. 6.)  Rutschke refused to sign the Release.  Northwest made further attempts to obtain clarification from Rutschke prior to his retirement, but Rutschke rebuffed those attempts.  While none of his leave was designated as FMLA leave after his refusal to secure further clarification of his doctor's certification, he was never denied any of his requested time off after that point.

Under the FMLA, "eligible employees are entitled to take leave from work for certain family or medical reasons, including a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" Cooper v. Olin Corp., Winchester Div., 246 F.3d 1083, 1090 (8th Cir. 2001) (quoting 29 U.S.C. § 2612(a)(1)).  "Among other prohibitions, FMLA prohibits an employer from interfering with an employee's exercise of her FMLA rights." Id. (citations omitted).  Section 2615 makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided."  29 U.S.C. § 2615(a)(1).  "An employer who violates this section shall be 'liable to any eligible employee affected' for compensatory damages and 'for such equitable relief as may be appropriate, including employment,

13

reinstatement, and promotion.'" Harrell v. United States Postal Service, ___F.3d___,

2005 WL 1669395, at *12 (7th Cir. July 19, 2005) (quoting 29 U.S.C. § 2617(a)(1)).

Northwest argues that because Rutschke's certification was ambiguous, it was

entitled to seek a clarification.  Both parties rely on the following FMLA regulation to

support their positions:

> If an employee submits a complete certification signed by the health care
> provider, the employer may not request additional information from the
> employee's health care provider.  However, a health care provider
> representing the employer may contact the employee's health care provider,
> with the employee's permission, for purposes of clarification and
> authenticity of the medical certification.

29 C.F.R. § 825.307(a).  Northwest urges, based on the regulation, that its requests for

clarification were justified and authorized.  In fact, Rutschke did take the certification

back to his physician and his physician did attempt to clarify the leave request.  Thus,

Rutschke argues that he was entitled to refuse Northwest's request that he sign the

Release.

The Court determines that Northwest was within its rights to seek further

clarification of Rutschke's certification.  The certification is inconsistent regarding how

much time per week Rutschke may be absent; while the certification states that the

"probable duration" of Rutschke's "present inability to work" was "intermittent inability

to work from ½ day to one week," it also stated that the "frequency and duration of the

current or expected episodes of incapacity" was "1-4 half day(s) during each . . . week."

(Warner Aff. Ex. 4 (emphasis added).)  The inconsistency between the entries created

14

ambiguity regarding how often and in what increments Rutschke was authorized to take

FMLA leave.  (See Van Steenburgh Aff. Ex. A (2/27/04 letter to Rutschke from his

supervisor noting that the above responses on the certification were "inconsistent and are

not adequate to permit [Northwest] to determine whether your absences are consistent

with the certification").)  Thus, Northwest was entitled to seek clarification from

Rutschke regarding the ambiguous aspects of his certification form.

Rutschke argues that Northwest interfered with his rights under the FMLA by

"demand[ing] that he sign [the Release] which it could not legally require him to sign."[7]

(Mem. in Opp'n at 24.)  But the Court need not determine whether Northwest was

entitled to deny Rutschke's FMLA certification based solely on his refusal to sign the

Release, because it did not do so.  Rutschke admits that he received a letter dated

February 27, 2004, from his supervisor at the time, requesting that he "[p]lease ask [his

physician] to clarify his certification form by indicating how often he expects that

[Rutschke] will be unable to work in the coming year, and the probable duration of these

periods."  (Van Steenburgh Aff. Ex. A.)  This letter was sent to Rutschke well after he

refused to sign the Release, and it makes clear that his FMLA application was still

pending at that point.  (See id. (letter stated supervisor was "writing in an effort to move

---

[7]Rutschke cites a U.S. Department of Labor Opinion Letter dated April 13, 2000 as
further support for his position (the "Opinion Letter").  (Mem. in Opp'n at 25.)  The
Opinion Letter states that "under the FMLA, the employer cannot acquire the employee's
medical records."  (Warner Aff. Ex. 9.)  As discussed below, the Court need not rely on
the Opinion Letter in coming to its conclusion regarding Rutschke's FMLA claim.

15

[Rutschke's] pending application for FML forward" (emphasis added).)  Further, the letter makes no mention of the Release—instead it specifically requests that Rutschke himself obtain the clarification from his doctor.  (Id.)  He did not respond to Northwest's repeated requests for clarification, stating that there was "no need to be . . . putting in applications for FMLA when I'm going to be, in 30 days I'm retired."  (Rutschke Dep. Tr. at 89.)  Rutschke has not presented the Court with any authority to suggest that Northwest was not acting within its rights in seeking further clarification of his FMLA certification, and the evidence belies his assertion that he was required to sign the Release in order to satisfy Northwest's requests.

Rutschke also attempts to raise a triable issue of fact regarding his FMLA interference claim by pointing to the alleged motivation behind Northwest's concern regarding how often Rutschke would be taking FMLA leave.  There is no dispute that Northwest questioned whether Rutschke's need for leave meant that "he need[ed] to work part time in order [to] maintain his health."  (Warner Aff. Ex. 5 (emphasis in original).)  According to Rutschke, Northwest's "scheme . . . was to allege 'confusion' over the . . . certification under FMLA as a pretext to allow the company's doctor to state an opinion that Rutschke was only able to work part-time."  (Mem. in Opp'n at 26.)  Even if this were true, however, Rutschke's argument fails because "[i]nterference claims under 29 U.S.C. § 2615(a)(1) . . . do not import from the Title VII discrimination framework consideration of the employer's conflicting motives."  Hoffman v. Professional Med Team, 394 F.3d 414, 419 n.9 (6th Cir. 2005) (citation omitted).  The Court's

16

determination of whether or not Northwest interfered with Rutschke's FMLA rights does not hinge on an analysis of Northwest's motives, see Throneberry v. McGehee Desha County Hosp., 403 F.3d 972, 979 (8th Cir. 2005); as discussed above, Northwest was acting within its rights to request clarification of a certification that was inconsistent on its face.  Accordingly, the Court determines that Rutschke's FMLA interference claim cannot survive this Motion.[8]

### B.     Constructive Discharge Due to Disability and Age Discrimination (ADA, ADEA & MHRA) (Counts 2, 4, 6 & 7)

Rutschke alleges that his retirement was a constructive discharge in violation of the ADA, ADEA, and MHRA.  (Mem. in Opp'n at 31.)  Rutschke contends that Fields harassed him in part by subjecting his work to heightened scrutiny, requiring Rutschke to report directly to him when Rutschke was taking FMLA leave, requiring Rutschke to clock out at a different location than other employees for a week before a general policy was announced changing the clock out location for all employees (including Rutschke),

---

[8]Northwest further argues that Rutschke cannot succeed on his claim of FMLA interference because he was never denied leave, even after he refused to sign the Release.  Thus, according to Northwest, Rutschke was never deprived of his substantive rights under the FMLA.  While it is not clear whether this is a correct statement of the law, see, e.g., Xin Liu v. Amway Corp., 347 F.3d 1125, 1135 (9th Cir. 2003) (holding that "the mischaracterization of [the plaintiff's] FMLA leave as personal leave qualifies as 'interference' with her leave"), the Court notes that, even if Northwest had interfered with Rutschke's rights under the FMLA, 29 U.S.C. § 2617 provides no remedy for such a violation where the plaintiff "was not harmed" by it, see Harrell, 2005 WL 1669395, at *12.

questioning Rutschke regarding when he had to take his lunch break, and expressing

disapproval when Rutschke elevated his feet due to his diabetes.

"Constructive discharge occurs when an employer deliberately renders the

employee's working conditions intolerable, thereby forcing [him] to quit." Tatum v.

Arkansas Dep't of Health, 411 F.3d 955, 960 (8th Cir. 2005) (internal quotation omitted).

To prove a case of constructive discharge, a plaintiff must show that: (1) a reasonable

person in his situation would find the working conditions intolerable, and (2) the

employer intended to force the employee to quit. Id. "[I]ntolerability of working

conditions is judged by an objective standard, not the employee's subjective feelings."

Gartman v. Gencorp, Inc., 120 F.3d 127, 130 (8th Cir. 1997) (internal quotation and

alteration omitted). Further, "part of an employee's obligation to be reasonable is an

obligation not to assume the worst and not to jump to conclusions too fast." Id. (internal

quotations and alteration omitted) (emphasis in original).

Here, there are no facts suggesting circumstances were such that Rutschke was

constructively discharged. To the contrary, the evidence belies his contention that his

working conditions were intolerable to the extent the conditions must be for his

retirement to constitute a constructive discharge. First, Rutschke's testimony regarding

his decision to retire indicates that he considered his options, weighed the costs and

benefits of retiring earlier than he had expected to and, after having reasoned through

these factors, he finally came to a decision to retire. He asked the pension department

how much less a month he would receive if he decided to retire in March 2003 rather than

18

waiting, and this factored into his decision.  Significantly, once he made the decision to

retire, he set his retirement date ("tentatively") for nearly two months out—he made his

final decision in early February 2004, and elected a retirement date of March 26, 2004.

This meant Rutschke was at work for almost two months after coming to his decision.

These circumstances simply do not indicate that intolerable working conditions sufficient

to state a claim for constructive discharge.

Second, it is undisputed that Rutschke decided to retire <u>after</u> he changed positions

in the company and came under the supervision of a different crew chief.  He testified

that Fields was the only person to discriminate against him, and that this occurred "until

January 20th, [2004], when [he] went to the composite shop."  (Rutschke Dep. Tr. at 98.)

He further testified:

> Q: And it's your testimony that when you went to the composite shop, the
> harassment stopped?
> A: Didn't have any problem at all.  It was real good there.
> Q: And the discrimination stopped?
> A: The discrimination, I didn't have any of that either.

(<u>Id.</u>)  Thus, by the time Rutschke decided to retire, he was removed from what he now

argues were intolerable working conditions.  He does not allege that he was subject to any

adverse working conditions after January 20, 2004, and his testimony is that he decided to

retire sometime after that date.  Further, he testified that he could have changed his

decision to retire after he had been working in the composite shop for a period of time.

(Rutschke Dep. Tr. at 197 ("Q: Could you have rescinded your decision to retire? A: Yes,

I could have.").)  These facts cannot be reconciled with Rutschke's claim that his working

19

conditions were intolerable.  See, e.g., Tatum, 411 F.3d at 960 (rejecting constructive

discharge claim where the plaintiff "was forced to work in the same office as [her

harasser], [but] she presented no evidence of any further harassment or inappropriate

behavior" in the roughly two months preceding her resignation).

Rutschke also argues that the "groundless requests for doctor recertification on the

pretext of a lack of clarity" regarding his FMLA claim contributed to the intolerable

working conditions and his decision to retire.  (Mem. in Opp'n at 34.)  He further

contends that phone calls and inquiries regarding when he was planning to retire were a

factor in the constructive discharge.  Again, these facts do not approach conduct "so

demeaning or abusive as to demonstrate an intolerable working environment intended to

force [Rutschke] to [retire]."  Breeding v. Arthur J. Gallagher and Co., 164 F.3d 1151,

1160 (8th Cir. 1999) (rejecting constructive discharge claim, noting that "[t]he working

atmosphere was not ideal, but a feeling of being unfairly criticized or having to endure

difficult or unpleasant working conditions are not so intolerable as to compel a reasonable

person to resign" (internal quotation and alteration omitted)).

## C.    Harassment and Hostile Work Environment Due to Age and Disability Discrimination[9] (ADEA, ADA & MHRA) (Counts 6 & 7)

---

[9]Rutschke merges his arguments regarding constructive discharge and hostile work environment such that it is difficult to tell whether he is pursuing independent hostile work environment claims.  (See, e.g., Mem. in Opp'n at 35, 37.) However, to the extent he alleges he was subjected to a hostile work environment, the Court addresses the issue below.

Rutschke contends that he was subjected to a hostile work environment on the basis of his age and disability due to the harassment he suffered from Fields.  (Mem. in Opp'n at 31-40.)  He claims that Fields treated him differently than his coworkers on specific occasions.  To establish a prima facie case of harassment, Rutschke must show: membership in a protected group; unwelcome harassment; harassment based on age or disability; the harassment affected a term, condition, or privilege of employment; and Northwest knew or should have known of the harassment and failed to take proper remedial action.  Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1047 (8th Cir. 2005); Breeding, 164 F.3d at 1158 (analyzing hostile work environment claims based on age and sex under same framework); Shaver v. Independent Stave Co., 350 F.3d 716, 720 (8th Cir. 2003) (ADA hostile work environment claim).  In order to prove the fourth element, that the harassment affected a term, condition, or privilege of employment, the employee must make a twofold showing.  First, the harassment must be sufficiently severe or pervasive to create an "objectively hostile" work environment.  Kratzer, 398 F.3d at 1047. Such conduct "must be more than merely offensive, immature or unprofessional; it must be extreme."  Id. (citation omitted).  Thus, "[c]onduct that does not exceed the threshold of severity is insufficient to create a prima facie case of . . . harassment."  Id.  "Second, if the victim does not subjectively perceive the environment as abusive, then the conduct has not altered the conditions of employment."  Id. (citation omitted).

Here, the fourth element is dispositive of Rutschke's claim.  A reasonable jury could infer that, based on the evidence Rutschke presented, he subjectively perceived his

work environment as hostile.  He complained twice to Northwest regarding "harassment by a manager in [his] shop," referring to Fields.  (Rutschke Aff. Ex. 1.)  In a September 13, 2003 e-mail to Northwest's human resources department, he went on to state "I have been with the airlines for 39 years and have never seen . . . the types of behavior that I have witnessed in the last couple of months."  (Id.)

The issue remains, however, whether the harassment Rutschke claims he suffered was "severe or pervasive enough to create an <u>objectively</u> hostile or abusive work environment."  <u>Henthorn v. Capitol Communications, Inc.</u>, 359 F.3d 1021, 1026 (8th Cir. 2004) (emphasis added).  Some factors the Court looks to in order to determine whether the harassment is severe or pervasive "include the frequency of the behavior, its severity, whether physical threats are involved, and whether the behavior interferes with plaintiff's performance on the job."  <u>Id.</u> (citation omitted).  The Court must determine whether Rutschke has proffered evidence "such that a reasonable person could find from it that [Rutschke] had been subjected to a work environment so hostile that a term, condition or privilege of [his] employment was altered."  <u>Id.</u> (internal quotation omitted).

Conduct that the Eighth Circuit has found sufficient to establish a prima facie case of discrimination is far more severe or pervasive than the conduct Rutschke describes.  <u>See, e.g.</u>, <u>id.</u> at 1027 n.3 (citing Title VII cases).  The incidents Rutschke highlights for the Court take the shape of an unpleasant relationship between a supervisor and employee; that Fields was not the fairest or most diplomatic supervisor does not compel the conclusion that Fields subjected Rutschke to a hostile or severe working environment.

Fields's conduct simply does "not cross the high threshold required to support a claim of . . . harassment." Id. at 1028.

That Rutschke felt singled out on occasion is not sufficient to raise an inference of harassment based on his disability or age. See, e.g., id. at 1025 (rejecting hostile work environment claim where the plaintiff, among other things, "felt that [the harasser] singled her out for more criticism than others received, including yelling at her in front of others"). Furthermore, the evidence shows that Fields's various instructions to Rutschke, which Rutschke felt were discriminatory or harassing, were often not followed through on or were eventually applied to all workers. For example, Rutschke argues that an incident in which Fields was inflexible regarding when Rutschke was to take his lunch break supports his harassment claim. (See Rutschke Dep. Tr. at 129-35.) However, Rutschke states that he "didn't get a chance to [file a grievance regarding the matter], because 45 minutes later [Fields] came down and he says, okay, he says, take your lunch at 6:00," which is the time Rutschke was asking to take it. (Id. at 133.) These types of disagreements simply do not rise to the level of harassment needed to establish a hostile work environment claim. See, e.g., Henthorn, 359 F.3d at 1028. Accordingly, the Court determines that Rutschke has failed to show that Fields's alleged harassment affected a term, condition, or privilege of his employment.[10]

---

[10]The Court also determines that, even if Rutschke had established Fields's harassment was sufficiently severe and pervasive to create an issue of fact regarding his hostile work environment claim, he failed to show that the harassment was based on his age or disability. He does not present any probative disability-related evidence, and the

**D.     Failure to Accommodate Rutschke's Disability and Interference with
        Rutschke's Right to an Accommodation (ADA, MHRA) (Counts 3, 5 &
        9)**

Rutschke claims that Northwest failed to accommodate his disability and interfered

with his right to an accommodation when, in December 2003, it stopped categorizing his

leave from work as FMLA leave.  He concedes that, up until that point, Northwest had

been accommodating his disability by approving his modified work schedule, and that

"using intermittent FMLA leave was successful and had not hampered Rutschke's job

performance."  (Mem in Opp'n at 31.)

To establish a prima facie case of discrimination under the ADA or MHRA, an

aggrieved employee must show that he or she (1) is disabled within the meaning of the

ADA or MHRA, (2) is qualified (with or without reasonable accommodation) to perform

the essential functions of the job at issue, and (3) has suffered an adverse employment

decision because of the disability.  Cravens v. Blue Cross and Blue Shield of Kansas City,

214 F.3d 1011, 1016 (8th Cir. 2000); Kammueller v. Loomis, Fargo & Co., 383 F3d 779,

784 (8th Cir. 2004) (citation omitted).  "Under the ADA and the MHRA, an employer

---

only age-related evidence Rutschke presents is that the pension department called him
twice to inquire regarding his retirement date, and that two of his former managers asked
him when he was retiring in passing.  The calls from the pension department followed
Rutschke's own inquiries, in April and October 2003, to the department regarding his
retirement options.  (Rutschke Dep. Tr. 91-91, 117-19.)  These facts do not raise an
inference of age-related animus.  See Montgomery v. John Deere & Co., 169 F.3d 556,
560 (8th Cir. 1999) (noting that "an employer may make reasonable inquiries into the
retirement plans of its employees and that a plaintiff should not be able to rely on those
inquiries to prove intentional discrimination").  Furthermore, as noted above, such
inquiries were not extreme, severe or pervasive.

must reasonably accommodate an employee's disability and engage in an interactive

process to identify potential accommodations that could overcome [his] limitations."

Burchett v. Target Corp., 340 F.3d 510, 517 (8th Cir. 2003) (citation omitted).  To

succeed on "[a] failure to accommodate claim, [Rutschke] must . . . show that [Northwest]

knew of, and failed to reasonably accommodate, his disability."  Kammueller, 383 F3d at

784 (citation omitted).

Assuming that Rutschke had demonstrated that he could not perform the essential

functions of his job without an accommodation[11], Burchett, 340 F.3d at 517, the Court

determines that he has failed to show that he was ever deprived of such an

accommodation by Northwest.  He claims that Northwest had accommodated his

disability in the past by providing him with intermittent leave, and that the denial of his

FMLA certification constituted a denial of that accommodation.  However, while his

FMLA application was pending due to Northwest's requests for further clarification, there

is no dispute that Rutschke took intermittent leave and was never disciplined for doing so.

Rutschke does not cite any authority for his argument that his leave needed to be labeled

FMLA leave in order to qualify as a reasonable accommodation under the ADA.  See,

e.g., Spangler v. Federal Home Loan Bank of Des Moines, 278 F.3d 847, 851 (8th Cir.

2002) ("The rights Congress created under the FMLA are fundamentally different than

those granted under the ADA.")  Viewing the facts in the light most favorable to

---

[11]The Court need not determine whether Rutschke was disabled or perceived as
disabled under the ADA or the MHRA.

Rutschke, the Court cannot conclude that Northwest failed to accommodate his disability.[12]

### E.     Reprisal and Retaliation (ADA, MHRA) (Counts 8 & 10)

Finally, Rutschke claims that he was subject to retaliation in violation of the ADA and reprisal in violation of the MHRA.  He states that his protected conduct were his complaints to Northwest human resources, and his efforts to seek a reasonable accommodation for his diabetes.  Rutschke complained to human resources regarding Fields's treatment of him twice: on September 13, 2003, by e-mail, and five or six weeks prior to that date, by phone.  (Rutschke Aff. Ex. 1.)  The September 2003 e-mail references harassment by Fields, though it does not indicate that his disability was the motivation behind the harassment.  He claims that he was "subjected to adverse action in the form of denial of protected leave and constructive discharge."  (Mem. in Opp'n at 41.)

To establish a prima facie case of retaliation or reprisal a plaintiff must show "a statutorily protected activity; an adverse employment action; and a causal connection between the two."  Kratzer, 398 F.3d at 1048 (citation omitted); Bergstrom-Ek v. Best Oil Co., 153 F.3d 851, 859 (8th Cir. 1998) (MHRA reprisal claim).  A plaintiff's failure to

---

[12]Rutschke is also unable to show that he suffered an adverse employment action, see Kammueller, 383 F.3d at 788 (noting that the plaintiff "must show that he suffered an adverse employment action because of his disability" to succeed on a failure to accommodate claim); as discussed above, his claims cannot rest on his allegation of constructive discharge.

demonstrate that he was subject to an adverse employment action is dispositive of his retaliation claim.  Id.

Assuming that Rutschke engaged in a protected activity under the ADA and the MHRA by complaining about Fields to the human resources department and by seeking a reasonable accommodation, his retaliation claim fails for lack of an adverse employment action.  As discussed above, the Court has determined that Rutschke was not constructively discharged, and thus his retirement does not serve as an adverse employment action.  That leaves for consideration Rutschke's argument that the "denial of protected leave" (Mem. in Opp'n at 41), constitutes an adverse employment action.  The Court determines, however, that because Rutschke actually received all of the leave he requested throughout his time at Northwest and he was never disciplined for taking time off, he has failed to show that the designation of his leave as sick or vacation time rises to the level of an adverse employment action for purposes of his retaliation and reprisal claims.  See, e.g., Baker v. John Morrell & Co., 382 F.3d 816, 829 (8th Cir. 2004) (noting that "[c]hanges in duties or working conditions that cause no materially significant disadvantage . . . are insufficient to establish the adverse conduct required to make a prima facie case" of retaliation).

However, even if the designation of Rutschke's leave as sick or vacation time could be considered an adverse employment action for purposes of the retaliation and reprisal claims, the Court determines that Rutschke has failed to raise a triable issue as to the causal connection between his protected conduct and the FMLA clarifications.

27

Rutschke relies mainly on the timing of his complaints to the human resources department in relation to the alleged adverse actions to establish the requisite causal connection.  (See Mem. in Opp'n at 41.)

The last complaint Rutschke made to Northwest's human resources department occurred in September 2003.  Contrary to Rutschke's allegation that this complaint prompted the denial of his FMLA leave, subsequent to that complaint—in late October 2003—Fields approved Rutschke's FMLA certification.  Fields testified that, based on his review of the documents at that time, Rutschke's FMLA certification was sufficient.  (See Fields Dep. Tr. at 33-34.)  Furthermore, it appears that Fields himself was not involved in determining whether clarifications would be requested of Rutschke regarding his FMLA leave.  (See, e.g., Fields Dep. Tr. 35-36, 45, 49.)  The facts do not support Rutschke's claim that he was being retaliated against for his complaints as to Fields or his requests for reasonable accommodations.  Accordingly, the Court will grant Northwest's Motion as to these claims.

## Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED** that Northwest's Motion for Summary Judgment (Doc. No. 19) is **GRANTED**, and Rutschke's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: August  30 , 2005                         s/Richard H. Kyle
                                                 RICHARD H. KYLE
                                                 United States District Court